1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8

TAMMY CURRY,

9

Plaintiff,

10

v.

11

BECTON, DICKINSON AND COMPANY,
a New Jersey corporation, C.R. BARD, INC.,

12

a New Jersey Corporation, and BARD
ACCESS SYSTEMS, a Utah Corporation,

13

and DOES 1 through 10,

14

Defendants.

**COMPLAINT**

**JURY DEMAND**

15     Plaintiff Tammy Curry states and alleges the following facts and causes of action against

16     the above-named Defendants:

17     1.     This is an action for damages relating to Defendants' design, development,

18     testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying,

19     and/or selling the defective device sold under the trade name of Power Port Groshong

20     (hereinafter "Power Port" or "Defective Device").

21     **PARTIES**

22     2.     Plaintiff, Tammy Curry, is an adult citizen of Tacoma Washington, and claims

23     damages as set forth below.

24     3.     Defendant Becton, Dickinson and Company ("BD") is a New Jersey corporation

25     with a principal place of business at 1 Becton Drive in Franklin Lakes, New Jersey.  BD is one of

the largest global medical technology companies in the world with diverse business units offering products in various healthcare subfields.  BD is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Power Port. BD is the parent company of Defendants C.R. Bard, Inc. and Bard Access Systems, Inc.

4.      Defendant C.R. Bard, Inc. ("Bard") is a New Jersey corporation with its principal place of business located in Murray Hill, New Jersey.  Bard is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Power Port. Bard, along with its subsidiaries and business units, was acquired by BD in 2017 in a transaction which integrated and subsumed Bard's business units into BD's business units.  In said transaction, Bard's product offerings, including the Power Port were taken over by and integrated into BD's Interventional segment, one of three of BD's principal business segments.

5.      Defendant Bard Access Systems, Inc. ("BAS") is a Utah corporation with its principal place of business located in Salt Lake City, Utah. BAS conducts business throughout the United States, including the State of Washington, and is a wholly owned subsidiary of BD. BAS is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Power Port.

6.      BD is the nominal corporate parent of Bard and BAS, but the latter two are alter egos of BD in that BD exercises complete domination and control over Bard and BAS, having

completely integrated the latter's assets, liabilities, and operations into its own such that Bard and BAS have ceased to function as separate corporate entities.

7.    BD's control over Bard and BAS has been purposefully used to perpetrate the violation of various legal duties in contravention of Plaintiff's legal rights.

8.    The breaches by BD of various legal duties as described herein are the proximate cause of the injuries described herein.

9.    Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District and (b) Defendants' products are produced, sold to and consumed by individuals in the State of Washington, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

12.    Defendants have and continue to conduct substantial business in the State of Washington and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this district, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

13.    Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendants, because Defendants are present in the

State of Washington, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## PRODUCT BACKGROUND

14.     The Power Port Groshong ("Power Port") is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants.

15.     According to Defendants, the Power Port is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

16.     The intended purpose of the Power Port is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

17.     The Power Port is a system consisting of two primary components: an injection port and a polyurethane catheter.

18.     The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

19.     The Power Port is "indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples."

20.     According to Defendants' marketing materials, the polyurethane catheter "has less propensity for surface biodegradation, making it more resistant to environmental stress cracking."

21.     The polyurethane comprising the catheter in the Power Port is a formulation called Chronoflex AL, which Defendants obtain from a biomaterials supplier called

AdvanSource Biomaterials Corporation (AdvanSource), which is a division of Mitsubishi Chemical America, Inc.

22. Chronoflex AL is one of a large number of biomaterials manufactured by AdvanSource, many of which have mechanical properties superior to Chronoflex AL.

23. The Chronoflex catheter included in Defendants' Power Port is comprised of a polymeric mixture of polyurethane and barium sulfate, a compound which is visible in certain radiologic studies.

24. Barium sulfate is known to contribute to reduction of the mechanical integrity of polyurethane *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the catheter.

25. The mechanical integrity of a barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the homogeneity of the modified polymer.

26. Defendants' manufacturing process in constructing the Chronoflex Catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles, leading to improperly high viscosity of the raw polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

27. This improper mixing led to pockets of barium sulfate and entrapped air being distributed through the catheter body and on the surface.

28. This defect in the manufacturing process led to a heterogeneous modified polymer which included weakened areas at the loci of higher barium sulfate concentration and led to fracture of the catheter.

29. Although the surface degradation and mechanical failure can be reduced or avoided with design modifications to encapsulate the radiopaque compound or by using a

different polymer formulation, Defendants elected not to incorporate those design elements into the Power Port.

30.    Defendants obtained "clearance" to market these products under Section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetic Act.

31.    Section 510(k) permits the marketing of medical devices if the device is substantially equivalent other legally marketed predicate devices without formal review for the safety or efficacy of the device. The FDA explained the difference between the 510(k) process and the more rigorous "premarket approval" ("PMA") process in its amicus brief filed with the Third Circuit in *Horn v. Thoratec Corp.*, which the court quoted from:

> A manufacture can obtain an FDA findings of 'substantial equivalence' by submitting a premarket notification to the agency in accordance with section 510(k) of the [Food Drug and Cosmetic Act.] 21 U.S.C. § 360(k). A device found to be 'substantially equivalent' to a predicate device is said to be 'cleared' by the FDA (as opposed to 'approved' by the agency under a PMA).

376 F. 3d 163, 167 (3d. Cir. 2004). A pre-market notification submitted under 510(k) is thus entirely different from a PMA, which must include data sufficient to demonstrate that the product involved is safe and effective.

32.    In *Medtronic, Inc. v. Lohr*, the U.S. Supreme Court similarly described the 510(k) process, observing:

> If the FDA concludes on the basis of the [manufacturer's] § 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can be marketed without further regulatory analysis…. The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in average of 20 hours …. As one commentator noted: "The attraction of substantial equivalence to manufacturers is clear. Section 510(k) notification required little information, rarely elicits a negative response from the FDA, and gets processed quickly.

33.    Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "the manufacturer remains under an obligation to investigate and report any adverse events associated with the drug…and must periodically submit any new information that may affect the FDA's

previous conclusions abut the safety, effectiveness, or labeling ….." This obligation extends to post-market monitoring of adverse events/complaints.

34.     At all times relevant, Defendants misrepresented the safety of the Power Port system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the Power Port system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

35.     At all times relevant to this action, Defendants knew and had reason to know, that the Power Port was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to fracturing, migrating, perforating internal vasculature and otherwise malfunctioning.

36.     At all times relevant to this action, Defendants knew and had reason to know that patients implanted with Power Ports had an increased risk of suffering life threatening injuries, including but not limited to: death; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

37.     Soon after the Power Port was introduced to market, which was years before Plaintiff was implanted with her device, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the Power Port was fracturing and migrating post-implantation. Defendants also received large numbers of AERs reporting that Power Port was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

    a.   hemorrhage;

    b.   cardiac/pericardial tamponade;

    c.   cardiac arrhythmia and other symptoms similar to myocardial infarction;

    d.   severe and persistent pain;

    e.   perforations of tissue, vessels and organs; and

    f.   upon information and belief, even death.

38.    Defendants were aware or should have been aware that the Power Port had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

39.    Defendants also intentionally concealed the severity of complications caused by the Power Port and the likelihood of these events occurring.

40.    Defendants knew and intentionally concealed the fact that the risk of catheter fracture increased with dwell time of the device.

41.    Rather than alter the design of the Power Port to make it safer or adequately warn physicians of the dangers associated with the Power Port, Defendants continued to actively and aggressively market the Power Port as safe, despite their knowledge of numerous reports of catheter fracture, migration and associated injuries.

42.    Moreover, Defendants' warnings suggested that fracture of the device could only occur if the physician incorrectly placed the device such that "compression or pinch-off" was allowed to occur. In reality, however, Defendants knew internally these devices were fracturing and causing serious injuries due to defects in the design, manufacturing and lack of adequate warnings.

43.    The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff. Defendants had actual knowledge of the dangers presented by the Power Port System, yet consciously failed to act reasonably to:

    a.  Adequately inform or warn Plaintiff, her prescribing physicians, or the public at

large of these dangers;

b.  Establish and maintain an adequate quality and post-market surveillance system; or

c.  Recall the Power Port System from the market.

**SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF**

44.    On or about January 27, 2014, Plaintiff was implanted with the Power Port, via right internal jugular vein, for administration of chemotherapy in treatment of breast cancer. This procedure took place at Riverside Regional Medical Center, Newport News Virginia, and was performed by Marshall A. Cross, M.D.

45.    Defendants, directly or through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, and sold the Power Port that was implanted in Plaintiff.

46.    On or about July 31, 2017, Plaintiff presented at Bon Secours Mary Immaculate Hospital in Newport News, Virginia. Plaintiff suffered pain near the Power Port sight. Plaintiff's Power Port became inaccessible and prevented her chemotherapy from being administered. A CT scan was performed and revealed that Plaintiff's Power Port had fractured and a piece of the catheter had moved down the right jugular vein. As a result of the breakage, approximately a week later, Jason Andrew M.D. performed surgery to remove the Power Port and catheter.

47.    Due to the defective device, Plaintiff suffered damages and continues to suffer damages including, but not limited to, undergoing an unnecessary major surgery, increased risk of future severe and permanent injuries, severe emotional distress, ongoing fear and anxiety from future injuries, including but not limited to, cardiac tamponade.

48.    The Defendants concealed—and continue to conceal—their knowledge of the Power Port's unreasonably dangerous risks from Plaintiff and her physicians.

49.     Numerous reports of Power Port catheter fractures and migration in the absence of physician error were recorded and reported to Defendants prior to the implantation of the Power Port in Plaintiff.

50.     However, Defendants continued to actively and aggressively market the Power Port as safe, despite knowledge of numerous reports of catheter fracture and migration. Defendants utilized marketing communications, including the Instruction for Use, and direct communications from sales representatives to Plaintiff's health care providers to intentionally mislead her health care providers into believing these failures were caused by physician error.

51.     Defendants did not adequately warn Plaintiff or Plaintiff's physicians of the true quantitative or qualitative risk of catheter fracture and migration associated with the Power Port.

52.     Defendants did not adequately warn Plaintiff or Plaintiff's physicians that the risk of catheter fracture of the Power Port increases with extended dwell time.

53.     Defendants did not adequately warn Plaintiff or Plaintiff's physicians that the function and integrity of the Power Port should be closely monitored when the device is in place for a period greater than one year.

54.     Defendants did not adequately warn Plaintiff or Plaintiff's physicians that the Power Port should be monitored for indicia of mechanical failure when the device is in place for periods greater than one year.

55.     Defendants did not adequately warn that the scope of catheter embolism extends beyond cases of pinch-off syndrome to Plaintiff or her physicians.

56.     Defendants did not adequately communicate the extent or seriousness of the danger of catheter fracture and resulting embolism to Plaintiff or her physicians.

57.     Rather than alter the design of their product to make it safer or warn physicians of the dangers associated with the Power Port, the Defendants chose to continue their efforts to promote their defective product.

58.     Plaintiff's physicians relied upon the representations, including the instructions for use distributed with the product implanted in Plaintiff, and advertisements to Plaintiff's detriment.

59.     The Defendants knowingly concealed the dangerous propensity of this device to fracture and/or dislodge and cause foreign materials to be introduced into the Plaintiff's bloodstream. Defendants further concealed their knowledge that these failures were occurring other than by doctor's causing pinch-off through placement, and that the failures were known to be causing serious injuries.

60.     As a result of the failure of the Defendants' Power Port and the Defendants' wrongful conduct in designing, manufacturing, and marketing this defective product, Plaintiff and Plaintiff's physician were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified in this Complaint, and that those risks were the direct and proximate result of the Defendants' acts, omissions and misrepresentations.

61.     The Defendants failed to conduct adequate and sufficient post-marketing surveillance after they began marketing, advertising, distributing and selling the Power Port.

62.     As a result of the Defendants' actions and inactions, Plaintiff was injured due to the use of the Power Port, which has caused and will continue to cause Plaintiff's various physical, mental, and emotional injuries and damages. Accordingly, Plaintiff seeks compensatory damages.

## COUNT I -- NEGLIGENCE
## (ALL DEFENDANTS)

63.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

64.     Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

-11-

65.     The Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling and conducting post-market surveillance of the Power Port.

66.     The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

a.  Failing to properly and thoroughly test the Power Port before releasing the device to market, and/or failing to implement feasible safety improvements;

b.  Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the Power Port;

c.  Failing to conduct sufficient post-market testing and surveillance of the Power Port;

d.  Designing, manufacturing, marketing, advertising, distributing, and selling the Power Port to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the Power Port and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

e.  Failing to exercise due care when advertising and promoting the Power Port; and

f.  Negligently continuing to manufacture, market, advertise, and distribute the Power Port after Defendants knew or should have known of its adverse effects.

67.     As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

**COUNT II**
**STRICT PRODUCTS LIABILITY – FAILURE TO WARN**
**(ALL DEFENDANTS)**

68.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

-12-

69.     Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

70.     Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Power Port, including the one implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

71.     At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer the medications. Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities, and further failed to adequately provide instructions on the safe and proper use of the device.

72.     Defendants knew or should have known at the time they manufactured, labeled, distributed and sold the Power Port that was implanted into Plaintiff that the Power Port posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

73.     Defendants further knew that these devices were fracturing and migrating for reasons other than "pinch-off" caused by the physician's initial placement of the device.

74.     As a result, the devices were unreasonably dangerous when put to a reasonably anticipated use in that the devices were dangerous to an extend beyond that which would be contemplated by the ordinary consumer who purchases it.

75. Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Power Port, in that Defendants failed to provide any warning that these devices could fracture and migrate for reasons other than "pinch-off" caused by the physician's initial placement of the device as described herein.

76. No reasonable health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

77. The warnings, labels, and instructions provided by the Defendants at all time relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

78. The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

79. The device, which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendants, was unreasonably dangerous at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product. .

80. When Plaintiff was implanted with the device, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

81. Defendants intentionally underreported the number and nature of adverse events with dislodgement and migration of the devices to Plaintiff's health care providers, as well as the FDA.

82. Neither Plaintiff nor her health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

83.    Plaintiff and her health care providers used Power Port in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream. Moreover, Plaintiff's health care providers did not place or maintain the device incorrectly such that it increased the risk of malfunction.

84.    Upon information and belief, the defective and dangerous condition of the device, including the one implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations. Upon information and belief, the device implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

85.    Defendants' lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries, and economic damages in an amount to be determined at trial. In other words, had Defendants provided adequate warnings, Plaintiff and her physicians would not have used the device.

## COUNT III – STRICT PRODUCTS LIABILITY
## MANUFACTURING DEFECT
## (ALL DEFENDANTS)

86.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

87.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

88.    Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Power Port that was implanted into Plaintiff.

-15-

89. The Power Port implanted in Plaintiff contained a manufacturing defect when it left Defendants' possession. The device differed from said Defendants' intended result and/or from other ostensibly identical unites of the same product line.

90. Upon information and belief, the Power Port implanted in Plaintiff varied from its intended specifications in, but not limited to, the following ways:

    i.    Defendants' manufacturing process in constructing the Chronoflex Catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles, leading to improperly high viscosity of the raw polyurethane before polymerization and causing improper mixing of barium sulfate particles with polymer matrix;

    ii.    This improper mixing led to pockets of barium sulfate and entrapped air being distributed through the catheter body and on the surface.

    iii.    This defect in the manufacturing process led to a heterogeneous modified polymer which included weakened areas at the loci of higher barium sulfate concentration and led to fracture of the catheter.

91. Plaintiff and her health care providers used the Power Port in a way that was reasonably foreseeable to Defendants.

92. The device's manufacturing defect was the direct and proximate cause of Plaintiff's serious physical injuries and economic damages in an amount to be determined at trial.

**COUNT IV**
**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
**(ALL DEFENDANTS)**

93. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

94. Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

95.    The Power Port implanted in the Plaintiff was not reasonably safe for its intended use and was defective with respect to its design.

96.    The Power Port was in a defective condition at the time that it left the possession or control of Defendants.

97.    The Power Port was unreasonably dangerous to the user or consumer.

98.    The Power Port was expected to and did reach the consumer without substantial change in its condition.

99.    Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

100.    As a direct and proximate result of the Power Port's aforementioned defects, the Plaintiff was caused and/or in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT V
## BREACH OF IMPLIED WARRANTY
## (ALL DEFENDANTS)

101.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

102.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

103.    Defendants impliedly warranted that the Power Port was merchantable and fit for the ordinary purposes for which it was intended.

104.    When the Power Port was implanted in the Plaintiff, it was being used for the ordinary purposes for which it was intended.

105.    The Plaintiff, individually and/or by and through her physician, relied upon Defendants' implied warranties of merchantability in consenting to have the Power Port implanted in her.

-17-

106.    Defendants breached these implied warranties of merchantability because the Power Port implanted in the Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications in, but not limited to, the following ways:

  i. Defendants' manufacturing process in constructing the Chronoflex Catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles, leading to improperly high viscosity of the raw polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer mixture;

  ii. This improper mixing led to pockets of barium sulfate and entrapped air being distributed through the catheter body and on the surface.

  iii. This defect in the manufacturing process led to a heterogeneous modified polymer which included the weakened areas at the loci of higher barium sulfate concentration and led to fracture of the catheter.

107.    Defendants' breaches of their implied warranties resulted in the implantation of unreasonably dangerous and defective Power Port in the Plaintiff's body, placing said Plaintiff's health and safety in jeopardy.

108.    The Power Port was sold to the Plaintiff's health care providers for implantation in patients, such as the Plaintiff.

109.    As a direct and proximate result of Defendants' breaches of the aforementioned implied warranties, the Plaintiff was caused and/or in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

-18-

110. On information and belief, Plaintiff's health care providers sent notice to Defendants of the adverse event and thus, the nonconformity of the device at issue, within a reasonable time following discovery of the breach of warranty and before suit was filed.

**COUNT VI**
**BREACH OF EXPRESS WARRANTY**
**(ALL DEFENDANTS)**

111. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

112. Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

113. Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted to Plaintiff's health care providers and/or Plaintiff that the Power Port was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

114. The Power Port does not conform to the Defendants' express representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury.

115. At all relevant times, the Power Port did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

116. Plaintiff, her physicians, and the medical community reasonably relied upon the Defendants' express warranties for the Power Port.

117. At all relevant times, the Power Port was used on Plaintiff by Plaintiff's physicians for the purpose and in the manner intended by Defendants.

118. Plaintiff and Plaintiff's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

119.    As a direct and proximate result of the breach of Defendants' express warranties, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

120.    On information and belief, Plaintiff's health care providers sent notice to Defendants of the adverse event and thus, the nonconformity of the device at issue, within a reasonable time following discovery of the breach of warranty and before suit was filed.

## COUNT VII
## FRAUDULENT CONCEALMENT
## (ALL DEFENDANTS)

121.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

122.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

123.    Beginning from the time Defendants introduced the devices to the marketplace and continuing to present, Defendants fraudulently concealed information with respect to the Power Port in the following particulars:

a.    Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the Power Port was safe and fraudulently withheld and concealed information about the substantial risks of using the Power Port;

b.    Defendants represented that the Power Port was safer than other alternative systems and fraudulently concealed information which demonstrated that the Power Port was not safer than alternatives available on the market;

c.    Defendants concealed that it knew these devices were fracturing and migrating from

-20-

causes other than the manner in which the implanting physician implanted the device; and

d.  That frequency of these failures and the severity of injuries were substantially worse than had been reported.

124.  The Defendants had sole access to material facts concerning the dangers and unreasonable risks of the Power Port.

125.  The concealment of information by the Defendants about the risks of the Power Port was intentional, and the representations made by Defendants were known by Defendants to be false.

126.  The concealment of information and the misrepresentations about the Power Port was made by the Defendants with the intent that Plaintiff's health care providers and Plaintiff rely upon them.

127.  Plaintiff and her physicians relied upon the representations and were unaware of the substantial risks of the Power Port which the Defendants concealed from the public, including Plaintiff and her physicians.

128.  As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

129.  The Defendants acted with oppression, fraud, and malice towards Plaintiff, who accordingly requests that the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing Defendants for their conduct, in an amount sufficiently large to be an example to others, and to deter these Defendants and others from engaging in similar conduct in the future.

130.    Had Defendants not concealed this information, neither Plaintiff's nor her health care providers would have consented to using the device in Plaintiff.

## COUNT VIII
## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
## (ALL DEFENDANTS)

131.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

132.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

133.    The acts and practices engaged in by Defendants constituted acts of deception, deceptive or unfair acts or practices, false pretenses, false promises, misrepresentations, concealments, and suppressions or omissions of material fact in violation of the Washington Consumer Protection Act, § 19.86 et seq.

134.    Defendants intended for others, including Plaintiff and Plaintiff's healthcare providers, to rely on their concealments and suppressions or omissions in connection with the sale and advertisement of the Defendants' product at issue here.

135.    Plaintiff purchased the Power Port, a product that was falsely represented, as set out above, in violation of the Washington Consumer Protection Act and as a result Plaintiff suffered damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory, and special damages together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendants as follows:

a.      Judgement be entered against all Defendant on all causes of action of this Complaint;

b.      Plaintiff be awarded her full, fair, and complete recovery for all claims and causes

-22-

of action relevant to this action;

c.    Plaintiff be awarded general damages according to proof at the time of trial;

d.    Plaintiff be awarded damages, including past, present, and future, medical expenses according to proof at the time of trial;

e.    Awarding pre-judgment and post-judgment interest to the Plaintiff;

f.    Awarding the costs and the expenses of this litigation to the Plaintiff; and

g.    For such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues.

DATED this 26th day of July, 2023.

Respectfully submitted,

**LEMMON LAW FIRM, LLC**

_/s/ Andrew A. Lemmon_
Andrew A. Lemmon
WA State Bar No. 53034
16212 Reitan Road
Bainbridge Island, WA 98110
Phone: (985) 783-6783
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

ATTORNEYS FOR PLAINTIFF

-23-